IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


REBECCA L. NICHOLS,                    *
                                       *
            Plaintiff,                 *
                                       *
vs.                                    *        No. 4:13CV00124 SWW
                                       *
TRI-NATIONAL LOGISTICS INC.;           *
RMR DRIVER SERVICES, INC.;             *
JAMES PARIS; CHARLES KYE; and          *
DONALD LEWIS,                          *
                                       *
            Defendants.                *


### Opinion and Order

Defendants Tri-National Logistics, Inc.; RMR Driver Services, Inc.; Charles Kye; and

Donald Lewis filed a motion for summary judgment to which plaintiff responded.  The Court

held a hearing on the motion on June 5, 2014.  Defendants later filed a reply to plaintiff's

supplemental response.  For the reasons stated below, the Court finds the motion for summary

judgment should be granted.

### Background[1]

On or about August 4, 2011, RMR Driver Services, Inc. ("RMR") hired plaintiff Rebecca

L. Nichols ("Nichols") as a company driver to operate vehicles owned by Tri-National Logistics

Inc. ("TNI").  On August 27, 2011, while driving solo for TNI, a highway patrol officer stopped

Nichols in McAllen, Texas, because her turn signals, tail lights, and other lights were not

working.  Upon being stopped, Nichols pulled into a drive at the front of a United States Border

---

[1]These background facts are taken mainly from the parties' statements of undisputed facts.  *See*
ECF Nos. 81 & 101.

Patrol building.  An inspection showed Nichols's truck's electrical cord or "pigtail" was not connected and her vehicle was written up for two out-of-service violations.  She did not receive a ticket.  Nichols admits that after she stopped for food about an hour earlier, she did not check the pig-tail connection because she had been out of the truck for only about 15-20 minutes.  When Nichols was leaving the Border Patrol station, the tractor trailer got stuck in some mud.  TNI had to pay $1200.00 in order to pull the truck out of the mud, during which the truck sustained damage.  TNI also paid for damage done to landscaping at the Border Patrol station.

Nichols was involved in an incident on September 7, 2011, in Ontario, Canada, which resulted in damage to the trailer door.  TNI determined both the McAllen and Ontario incidents were preventable, and under its policy, preventable incidents/accidents are grounds for termination if they occur within the first 60 days of employment.  On September 26, 2011, TNI terminated Nichols.

Charles Kye was TNI's Vice-President of Operations.  After  Nichols contacted Kye a number of times, she prevailed on him to re-hire her.  Nichols returned to work on October 17, 2011.  As a condition of being rehired, Kye told Nichols she would have to drive team and that she would have to find a driver who would agree to drive with her.  The first driver with whom Nichols teamed was Catherine Harrington.  They drove together from October 17, 2011 to October 29, 2011.  Ms. Harrington stopped teaming with Nichols.

From December 14-24, 2011, Nichols drove with Robert Ripke who reportedly told Donald  Lewis, TRI's Filed Safety Supervisor, that Nichols was an unsafe driver.  From January 20 to May 8, 2012, Nichols teamed with Lance Wehrle.  On February 2, 2012, Nichols received a citation from the Georgia Department of Public Safety relating to a non-injury accident

involving three vehicles.  The citation was for failure to yield at the intersection of a roadway

where Nichols had a stop sign and the cross traffic did not.  The accident report says Nichols left

the scene.  She entered a plea of *nolo contendre* to the charge of failure to yield and paid a fine.

TNI says it paid approximately $2,500.00 for property damage as a result of that accident.

After she and Wehrle had an argument, Nichols began driving with James Paris.  She

drove with Paris from May 8 to May 13, 2012.  She said that during that period of driving

together, Paris indicated he wanted to have a relationship with her.  Nichols says she declined

and Paris seemed okay about it.  Nichols drove with Paris again from May 25, 2012 to June 1,

2012.  Paris picked up Nichols at TNI's terminal in Bryant, Arkansas around midnight on the

morning of May 25.  Lewis says that on the evening of May 25, he spoke to Nichols  at TNI's

terminal in Laredo, Texas.  According to Lewis, Nichols said things were fine between her and

Paris.  Nichols testified that sometime after she got back on the truck with Paris on May 25,

2012, he exposed himself to her in the truck. She testified he exposed himself several times.

Nichols admits that she did not call TNI to complain about Paris until he started exposing

himself.  She says she called Melissa Foust, Safety Administrator with TNI, several times and

asked Foust for help in finding someone else with whom to drive.  Ms. Foust told Nichols she

would have to find a new co-driver herself.  Nichols continued to team with Paris on his truck

until June 1, 2012.   On May 30, 2012, Paris went home to Pharr, Texas for a mandatory restart

or rest period, driving the truck to his apartment.  Nichols called Bob Oliver, her dispatcher, and

asked him if she could take the truck while Paris was on restart and Oliver said yes.  Later,

Oliver called Nichols to tell her she could not take the truck because Paris's possessions were in

it.  That night, Nichols slept in the sleeper compartment of the truck, which was parked at Paris's

apartment complex.

Nichols testified that the major incident of sexual harassment took place the next day, on May 31, 2012, while she and Paris were at his residence in Pharr during his rest period.  She said Paris demanded that she sleep with him and when she refused, he verbally harangued her for several hours and twice forcibly took her truck keys and cell phone.  He did not sexually assault her at his apartment.  Plaintiff did not call TNI on either May 31 or June 1, 2012, about the incident.

On May 31, 2012, Paris drove Nichols to a motel where she spent the night.  She did not call TNI although she did call in food orders three times.  She says that after making the last call for food around 3:24 p.m., her cell phone went dead and she could not charge it because the charger was in the truck.  She testified she was afraid Paris would come to the motel and break in on her.  Although phone records show Nichols did not make any calls after 3:24 p.m. on the 31st, the records show she exchanged text messages with Paris between 6:18 p.m. on May 31 and 8:41 a.m. on June 1.  On June 1, 2012, Nichols exchanged several phone calls with Paris between 9:09 a.m. and 1:04 p.m.

Paris and Nichols left his apartment in the truck at approximately 2:08 p.m. on June 1, 2012.  At approximately 6:49 p.m., Nichols got off Paris's truck at the TNI terminal in Laredo, Texas, and onto the truck of Chris Loya.  After she got onto Loya's truck, she talked to Lewis about the alleged May 31st incident with Paris.  Plaintiff teamed with Loya from June 1 to June 22, 2012.   For a period of time while she was teaming with Loya, Nichols exchanged phone calls and text messages with Paris.

 Loya testified that after about three weeks of driving with Nichols, he contacted Oliver,

his dispatcher, and Lewis, to report his concerns about Nichols's driving.  Lewis recommended to Kye that Nichols be terminated because she was an unsafe driver.  Lewis said he considered all of the accidents/incidents in which Nichols had been involved, including those that happened before she was terminated the first time.   Kye says he made the decision to terminate Nichols for safety reasons.  He says he did not know that Nichols had complained about being sexually harassed at the time he terminated her on June 25, 2012.

On June 29, 2012, Foust submitted a "DAC Report" to HireRight, a system to which carriers report driver information upon termination of the driver.  Carriers rely on the information as part of their background checks of potential new hires.  The DAC Report stated that Nichols had an unsatisfactory safety record and that there had been excessive complaints against her.  The report further stated that Nichols had been terminated during her probationary period, that she was not eligible for rehire, and that she was involved in a non-DOT recordable accident that occurred on August 27, 2011, in McAllen, Texas, when Nichols "ran off the roadway."

On June 29, 2012, Nichols submitted an intake form to the Equal Employment Opportunity Commission ("EEOC") claiming sex and age discrimination and retaliation.  She did not mention sexual harassment.  TNI and RMR say they were not aware of Nichols's EEOC charge until after the DAC Report was submitted to HireRight.  Nichols filed a dispute of the DAC Report with HireRight and HireRight informed TNI of Nichols's dispute.

Nichols filed a complaint on January 17, 2013, in state court in Saline County, Arkansas, asserting claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000(e), and the

Arkansas Civil Rights Act of 1993 (the "ACRA"), Ark. Code Ann. § 16-123-101 *et seq*.; intentional infliction of emotional distress; and violation of the Fair Credit Reporting Act "FCRA"), 15 U.S.C. § 1681s-2(b).   On March 8, 2013, TNI, RMR, and Kye removed the case. Defendants TNI, RMR, Kye, and Lewis move for summary judgment on all counts of Nichols's complaint.

### Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The non-moving party may not rest on mere allegations or denials of her pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587

(citations omitted).  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will

not be counted."  *Id.*

## Discussion

Nichols claims she was sexually harassed and then terminated in retaliation for

complaining about sexual harassment.   She brings her discrimination claims under both Title

VII and the ACRA, and sues Lewis and Kye in their individual and official capacities.[2]

1.  Applicability of Claims under the ACRA

TNI, RMR, Kye, and Lewis argue they are entitled to summary judgment on Nichols's

discrimination claims under the ACRA because the harassment and retaliation about which she

complains occurred outside the State of Arkansas.[3]  Citing *Bank of August v. Earle*, 38 U.S. 519

(1839) and *State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003), defendants argue

that Arkansas does not have supervision over the internal affairs of another state even if her

citizens' health and welfare may be affected when they travel to that state.  They further point

out that the ACRA's definition of "employee" does not include an individual employed outside

---

[2]"[S]upervisors may not be held individually liable under Title VII."  *Clegg v. Arkansas Dep't of Correction*, 496 F.3d 922, 931 (8th Cir. 2007)(internal citation and quotation omitted).  The ACRA holds only employers liable for employment discrimination but indivdua1 supervisors can be personally liable for alleged acts of retaliation.  *Calaway v. Practice Mgmt. Servs., Inc.* 2010 Ark. 432, *3-4 (2010).

[3]The evidence suggests that all of Paris's allegedly unlawful conduct took place in states other than Arkansas, primarily Texas, or at least, Nichols cannot state that any of the acts happened in Arkansas.  Nichols's allegedly retaliatory termination took place by way of a telephone call from TNI's office in Missouri and the DAC reports were submitted from the same office.

the State of Arkansas.[4]  Therefore, they argue, the ACRA is not applicable to Nichols.

The Court finds the ACRA applicable to Nichols's complaint.  She is an Arkansas resident whose job site included TNI's terminal in Bryant, Arkansas.  She left from that terminal on the trips with Paris, the alleged sexual harasser.

2.  Sexual Harassment Claims

The elements of a Title VII discrimination claim and the ACRA are identical. *McCullough v. Univ. of Arkansas for Med. Sciences*, 559 F.3d 860, 861 (8th Cir. 2009).  To succeed on a harassment or hostile work environment claim, Nichols must establish: (1) she was a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) that her employer knew or should have known of the harassment and failed to take appropriate remedial action.  *Jackson v. Fifth Judicial Dist. Dep't of Correctional Servs.*, 728 F.3d 800, 805-06 (8th Cir. 2013).   "To be actionable under Title VII, the work environment must have been both objectively and subjectively offensive."  *Bainbridge v, Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's  employment, and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotations omitted).  " This 'demanding' standard requires 'extreme' conduct 'rather than merely rude or unpleasant' conduct."  *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014).

Under Title VII, an employer's liability for such harassment may depend on the

---

[4]Ark. Code Ann. §16-123-102(4)(C)(Repl. 2006).

status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.  Under this framework, therefore, it matters whether a harasser is a 'supervisor' or simply a co-worker.

*Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434, 2439 (2013) (citations omitted).  "[ A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim . . ."  *Id.*

In her complaint, Nichols describes Paris as her co-driver.  In response to the motions for summary judgment, Nichols argues that Paris could be considered a supervisor because he was the lead driver and, according to Paris, was responsible for "decisions."[5]  While Paris may have been responsible for the truck as the lead driver, the Court finds Nichols presents no evidence to support a finding that Paris had the kind of authority for him to be considered a supervisor for the purposes of Title VII liability.  *See E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657 (8th Cir.2012)(lead drivers who had no authority to hire, fire, promote, or reassign to different duties not considered supervisors).

TNI and RMR argue there is no evidence that they ignored or unreasonably delayed responding to Nichols's complaints of sexual harassment.  Nichols testified that the most egregious conduct of Paris happened at his apartment on May 31, 2012.  TNI and RMR assert Nichols did not report that conduct until she stopped driving with Paris.  They also  contend

---

[5]ECF No. 121-1 (Paris Dep.) at 22.

there is no evidence that Nichols made any report to them about Paris exposing himself until

May 31, 2012, when she and Paris got into an argument about Nichols taking the truck.  Two

days later, Nichols was no longer driving with Paris.  Even if Paris did expose himself sometime

after Nichols got back on the truck with him on May 25, TNI and RMR argue she drove with

him less than a week.

They further contend Nichols cannot show that she subjectively considered Paris's

behavior as creating a hostile environment prior to May 30, 2012, as she continued to drive with

Paris and told Foust she wanted to stay on the truck while she looked for another driver.  Lastly,

TNI and  RMR say they cannot be held negligent for Paris's actions of May 31, 2012, because

they occurred outside of working hours at Paris's apartment.

In response, Nichols states she talked to Foust about Paris wanting to be romantically

involved with her[6] and told Foust she did not want to get off Paris's truck until she had another

one.[7]  She says she also complained to Foust on a number of occasions about Paris exposing

himself.[8]   Nichols testified she could not remember when she first complained to Oliver about

Paris but knows she talked to him several days before she and Paris got to his apartment.  She

says she told Oliver she needed to get off the truck because Paris was sexually harassing her, and

that Oliver told her to try to endure the situation until after Paris went home.[9]  Nichols said she

talked to Oliver again about using the truck during Paris's restart period and Oliver told her to

---

[6]ECF No. 99-1 (Nichols Dep.) at 12-13.

[7]*Id*. at 23.

[8]*Id*. at 13-15.

[9]*Id*. at 21-22.

try to get along with Paris until they got back on the road together.  According to Nichols, Oliver

told her they would see about getting her in another truck.[10]  She said Oliver also told her to go

get a motel room and to send the company the bill and they would pay half of it.[11]

Foust testified that Nichols called her and told her that Paris was treating her in a

demeaning fashion and walking around the truck in his underwear.  Foust said she told Ernie

Davis, the safety director, about the conversation, and told Davis that she had recommended to

Nichols that she find a female teammate.[12]  Oliver testified that it was during the series of calls

about taking the truck during Paris's restart that Nichols told him about Paris parading about in

his underwear.  Oliver said he transferred Nichols's call to Foust and that he never told Kye or

Lewis about the incident.[13]

To support her claim that TNI knew that Nichols was being sexually harassed, Nichols

points to testimony from Cathy Harrington, who drove with Nichols for about two weeks.

TRI/RMR initially hired Nichols in August 2011 as part of a team with Donisio Comacho, a

married man who Nichols testified was her boyfriend.[14]  Harrington was the first driver with

whom Nichols drove after being rehired in October 2011.  Harrington said Nichols complained

to her about her previous team drivers and was very frustrated about not being allowed to drive

alone.  According to Harrington, Nichols said that if she had to perform oral sex in order to keep

---

[10]*Id*. at 29.

[11]*Id*. at 30.

[12]ECF No. 99-2 (Foust Dep.) at 4-5; ECF No. 99-7 (Davis Dep.) at 3-4.

[13]ECF No. 99-8 (Oliver Dep.) at 3-5.

[14]ECF No. 81-2 (Nichols Dep.) at 4; ECF No. 81-8 (Harrington Dep.) at 7.

her job she would.  Harrington said Nichols was on the telephone hundreds of time, talking with Kye and Oliver, among others, complaining about not being allowed to drive alone and what she believed she would have to do to keep driving.[15]  Harrington said she reported Nichols's complaints to Lewis and his response was that what Nichols did was her business.  Harrington said she called Oliver while she was driving with Nichols and Oliver told Harrington to do the best she could, stay safe, and that he would take care of things when she and Nichols got home.[16] Harrington said Nichols was having an affair with Comacho  but Nichols never told Harrington that she had been propositioned by any driver at TNI or had sex with anyone else at TNI.[17]

The manager of TNI's terminal in Bryant, Arkansas, Jason Sypes, testified that Nichols told him Comacho was sexually harassing her but Sypes did not report it because Nichols and Comacho were no longer driving together and Nichols did not ask him to do anything more.[18] James Paris testified that Nichols continuously complained that the company was out to get her and would not listen to any of her complaints.  He said that he reported this to Lewis and Oliver when he decided to split up with Nichols, shortly before they departed company in Laredo.[19]

The Court determines that a reasonable juror could not find TNI and RMR were negligent in their  response to Nichols's complaints of sexual harassment. There is no credible evidence that Nichols complained to any of the defendants about Paris's behavior until after

---

[15]ECF No. 99-3 (Harrington Dep.) at 4-8.

[16]*Id*. at 10-14.

[17]*Id*. at 18.

[18]ECF No. 99-4 (Sypes Dep.) at 7-8.

[19]ECF No. 121-1 (Paris Dep.) at 7-8.

Nichols and Paris were no longer driving together.  Further, there is not sufficient evidence to establish that Nichols subjectively considered Paris's behavior prior to May 31 so severe or pervasive to alter the conditions of her employment or to create an abusive working environment.

    3.  Retaliation Claims

    To establish a *prima facie* case of retaliation, Nichols must prove: (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) the materially adverse action was causally connected to her protected activity.  *See Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.,* 728 F.3d 800, 804 (8th Cir. 2013).  "To establish causation, [Plaintiff] must prove 'the desire to retaliate was the but-for cause of' her termination - that is, 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [Defendant].'" *Wright v. St. Vincent Health System,* 730 F.3d 732, 737-38 (8th Cir. 2013), *citing Univ. of Texas SW Med, Ctr. v. Nassar,* ___ U.S. ___, ___ , 133 S.Ct 2517, 2528, 2533 (2013).

    TNI fired Nichols three weeks after she complained about the sexual harassment by Paris.  The company then filed a DAC report with HireRight documenting Nichols's driving record.  She claims these actions were in retaliation for her complaints about Paris.  TNI, RMR, Kye, and Lewis assert they terminated Nichols because she was an unsafe driver.  They further state they were not aware that Nichols had filed an EEOC charge at the time they filed the DAC report.

    Generally, more than a temporal connection is required to establish a causal connection. *Tyler v. University of Arkansas Board of Trustees*, 628 F.3d 980, 985 (8th Cir. 2011).  Both Kyle

and Lewis testified that they were not aware of Nichols's complaints about Paris until after they made the decision to fire her.  There is no question that when TNI, RMR, Kye, and Lewis rehired Nichols, they were concerned about her performance.  During the approximately five month period from her re-hire to her termination, Nichols drove with five different drivers.  They all complained about her driving.[20]  Harrington testified she stopped driving with Nichols after about two weeks because she considered Nichols an unsafe driver.  Harrington said she told Lewis that Nichols would not listen to instructions and that Nichols was putting herself, Harrington, and everybody on the road in danger.[21]  Nichols drove with Robert Ripke for ten days.  Lewis testified that Ripke told him Nichols was an unsafe driver.  Nichols drove with Lance Wehrle for about three and one-half months.[22]  During this time, Nichols was involved in an accident.  The accident report said she left the scene and she received a citation for failure to yield.  Nichols entered a plea of *nolo contendre* to the charge and paid a fine for the violation.  TNI paid for the property damage to the truck.[23]  According to Lewis, Wehrle said Nichols was an inattentive driver, ran red lights, and tailgated.[24]

   After co-driving with Paris, Nichols drove Chris Loya.  Loya testified that he contacted Lewis and Oliver to report his concerns with Nichols's driving.  Loya complained Nichols exceeded the speed limit, was inattentive to traffic lights, and talked on her cell phone while

---

[20]ECF No. 81-3 (Lewis Aff.) at ¶ 14.

[21]ECF No. 81-8 (Harrington Dep.) at 6-7.

[22]ECF No. 81-5 (Bailey Aff.) at ¶ 18.

[23]ECF No. 81, ¶¶ 46-51.

[24]ECF No. 81-22 (Lewis Dep.) at 6.

driving.  He said he had trouble sleeping while Nichols was driving because her driving made him nervous.

After Loya reported to Lewis that Nichols was an unsafe driver, Lewis recommended to Kye that Nichols be terminated because she was unsafe.  Lewis said he was unaware of Nichols's claim of sexual harassment at the time he made his recommendation.  Thereafter, Kye informed Lewis that he had decided to terminate Nichols and asked Lewis to tell her.  On June 25, 2012, Lewis told Nichols she was terminated because of safety reports and concerns about her driving.

Nichols argues these reasons are pretextual and the real reason she was terminated is because she complained about sexual harassment.  She argues the DAC reports were submitted to HireRight in retaliation for her submitting an intake form to the EEOC.

The Court finds Nichols has not presented evidence sufficient to create a genuine dispute as to whether the facts alleged give rise to retaliatory discharge.   The evidence is clear that Nichols had driver safety issues.  There is no credible evidence from which a reasonable juror could find that defendants' reasons were pretextual and but for the complaint of sexual harassment they would not have terminated her.  Accordingly, TNI, RMR, Kye, and Lewis are entitled to summary judgment on Nichols's retaliation claims under Title VII and the ACRA.

4.  Intentional Infliction of Emotional Distress

Nichols claims that Paris's behavior was outrageous and, by extension,  TNI's and RMR's  failure to immediately remove her from the situation and require her to get back on the truck with Paris until she got to Laredo constitute the tort of outrage.  TNI and  RMR argue Nichols's claim is barred by the exclusivity clause of the Workers' Compensation Act.

"Arkansas Code Annotated section 11-9-105 (repl. 2002) provides that the rights and remedies granted to employees under the Arkansas Workers' Compensation Act are exclusive of all other rights and remedies that an employee has against an employer." *Guerrero v. OK Foods, Inc.*, 230 S.W.3d 296, 297 (Ark. App. 2006) .  There is an exception, however, and that is in cases "where an employer intentionally inflicts an injury upon an employee. . . . This 'intentional-tort exception' to the exclusive-remedy doctrine . . . has been narrowly construed." *Id* at 298. "[O]ur supreme court recognized that the exception applies to acts 'committed with an actual, specific, and deliberate intent on the part of the employer to injure the employee,' and that the employee's complaint must be 'based upon allegations of an intentional or deliberate act by the employer with a desire to bring about the consequences of the act.'" *Id*.  *See also Angle v. Alexander*, 945 S.W.2d 933, 935 (Ark. 1997)("before an employee is free to bring a tort action for damages against an employer, the facts must show the employer had a 'desire' to bring about the consequences of the acts or that the acts were premeditated with the specific intent to injure the employee")(citations omitted).

There is no evidence from which a reasonable juror could find that TNI or RMR deliberately or intentionally acted with a desire to bring about actions that would harm Nichols.

    5.  Fair Credit Reporting Act Violation

Nichols complains about the information TRI and RMR entered on the DAC reports they submitted to HireRight after Nichols's termination in September 2011 and after her termination in June 2012.  On September 30, 2011, Foust submitted a DAC report that said Nichols was terminated during her probationary period, was not eligible for rehire, and that she was involved in a non-DOT recordable preventable accident/incident that happened in McAllen, Texas, when

she ran off the roadway.   TRI rehired Nichols on October 17, 2011, and then terminated her on

June 25, 2012.  On June 29, 2012, Foust submitted another DAC report which noted Nichols had

excessive complaints and an unsatisfactory safety record and had a non-DOT recordable accident

in West Point, Georgia.  Nichols filed a dispute of the DAC with HireRight, and HireRight

informed TRI of the dispute.  Ms. Laura Bailey, TNI's Safety Administrator, said she

investigated the reports and realized that the accident which occurred in Ontario, Canada, had

not been included on the initial September 2011 DAC report so she submitted a revised report

that included the incident.  She also corrected the entry that said Nichols was not eligible for

rehire to "rehire upon review."[25]  Bailey said that when Nichols continued to dispute the DAC

reports after her June 2012 termination, Bailey decided to further revise the reports by removing

the "ran off the roadway" description of the August 2011 incident in McAllen, Texas, and the

statements on her work record of "excessive complaints" even though both statements were

true.[26]

In bringing claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et*

*seq*., Nichols alleges TRI and RMR violated the Act "by failing to adopt, maintain, and follow

reasonable procedures in the preparation of consumer credit reports which led to the distribution

of erroneous, incomplete or otherwise inaccurate information that in turn caused employers to

reject Ms. Nichols' applications for hire."  Compl. at ¶ 123.  She also alleges defendants knew or

should have known that "classifying entries on Ms. Nichols' safety record as 'Accidents' rather

than "Incidents' was incorrect."  Compl. at ¶ 125.  The parties dispute whether Nichols can state

---

[25]ECF No. 81-5 (Bailey Aff.)  at ¶30.

[26]*Id*. at ¶31.

a claim under the FCRA.

> Under 15 U.S.C. §§ 1681n & 1681o, any person who willfully or negligently fails to comply with any of the FCRA's requirements is subject to civil liability. For entities that furnish information to credit reporting agencies, entities such as Capital One, the FCRA sets out two general requirements: (1) the duty to provide accurate information; and (2) the duty to investigate the accuracy of reported information upon receiving notice of a dispute. 15 U.S.C. § 1681s–2(a) & (b).

> The FCRA is clear that there is no private right of action for alleged violations of section 1681s–2(a), the requirement that furnishers provide accurate information to credit reporting agencies. 15 U.S.C. § 1681s–2(c)(1); *Huertas v. Galaxy Asset Management,* 641 F.3d 28, 34 (3d Cir.2011); *Gordon v. Greenpoint Credit,* 266 F.Supp.2d 1007, 1010 (S.D.Iowa 2003). There is no statutory bar, however, against pursuing a private claim against a furnisher for a violation of section 1681s–2(b), the requirement that furnishers investigate the accuracy of reported information after getting notice of a dispute.

> Whether a consumer can pursue this type of claim is an open question in our Circuit. But most other Courts of Appeals to consider the issue have answered the question yes. *See, e.g., SimmsParris v. Countrywide Financial Corp.,* 652 F.3d 355 (3d Cir.2011); *Chiang v. Verizon New England Inc.,* 595 F.3d 26 (1st Cir.2010); *Saunders v. Branch Banking & Trust Co. of Virginia,* 526 F.3d 142 (4th Cir.2008); *Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057 (9th Cir.2002); *but see Geeslin v. Nissan Motor Acceptance Corp.,* No. 99–60410, 2000 WL 1056120 (5th Cir.2000) ( *per curiam* ).

> This Court agrees with the greater weight of authority: private suits are allowable under section 1681s–2(b).

*Ilodianya v. Capital One Bank USA NA*, 853 F.Supp.2d 772, 773 -774 (E.D.Ark.,2012).

Nichols's allegations are directed to the accuracy of the information entered on the DAC reports.  She makes no complaint that TNI failed to adequately respond to her dispute of the initial reports and her allegations relate to information contained in the DAC reports initially submitted by TNI to HireRight. There is no private cause of action for improperly furnishing information to a credit reporting agency, and subsection (d) of §1681s-2 specifically provides that the provisions of subsection (a) "shall be enforced exclusively as provided under section

18

1681s of this title by the Federal agencies and officials and the State officials identified" in that section.

Because Nichols has no private cause of action under subsection (a) and fails to demonstrate a genuine issue of material fact as to TNI's response to her dispute, the Court finds TNI and RMR are entitled to summary judgment on Nichols's FCRA claim.

**Conclusion**

For the reasons stated above,  the Court grants the motion for summary judgment [ECF No. 80].  Nichols's claims against TNI, RMR, Kye, and Lewis are dismissed.  The motion to strike [ECF No. 128] is denied as moot.

DATED this 21st day of August, 2014.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE